United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Spliethoff Bevrachtingskantoor B.V., Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 21-61422-Civ-Scola |
| United Yacht Transport LLC, Defendant. | ) ) | |

### Omnibus Order

This matter is before the Court on the parties' cross-motions for summary judgment, which have been fully briefed and are ripe for review. (ECF Nos. 93, 97, 111, 114, 129, 130.) For the reasons below, the Court **denies** Defendant United Yacht Transport LLC's ("UYT") motion for summary judgment (**ECF No. 97**) and **grants** Plaintiff Spliethoff Bevrachtingskantoor B.V.'s ("Spliethoff") motion for summary judgment (**ECF No. 93**).

But before moving on, some housekeeping is appropriate. Also pending before the Court is Spliethoff's motion to take judicial notice of the following (ECF No. 92): (1) filings in Trademark Trial and Appeal Board ("TTAB") Opposition No. 91219279, (2) United States Patent and Trademark Office ("U.S.P.T.O.") documents related to this matter, (3) the Port Everglades Facilities Guide & Directory for 2020 and 2021-2022, and (4) printouts from the current Port Everglades website.

The Court takes judicial notice of the U.S.P.T.O. files but declines to take notice of the rest. The third and fourth sets of documents are of little import to the legal inquiries before the Court, and Spliethoff presents the first set of documents in support of its res judicata theory. (*See* ECF No. 106 at 1-2). As discussed below, the Court finds that theory unconvincing. Accordingly, the Court **partially grants** Spliethoff's motion for judicial notice. (**ECF No. 92**).

### 1. Background

The undisputed facts are as follows: In 1992, two "heavy lift" maritime transport companies named Dock Express Shipping and Wijsmuller Transport, formed a joint venture called "UNITED YACHT TRANSPORT" to transport yachts on semi-submersible vessels using a "float-on, float off" loading method. (Pl.'s SOMF ¶ 1, ECF No. 94; Def.'s Resp. SOMF ¶ 1, ECF No. 112.) The joint venture led to the creation of United Yacht Transport (USA), Inc., which carried out its business from Port Everglades, Florida, and was the only company in the world to offer semi-submersible yacht transport services on its massive,

distinctively colored, orange and white vessels. (Pl.'s SOMF ¶ 7A; Def.'s Resp. SOMF ¶ 7A.) In June 2000, United Yacht Transport (USA), Inc. changed its name to Dockwise Yacht Transport (USA), Inc. and in November of that year, its parent company obtained a U.S. trademark registration for the stylized mark below. (Pl.'s SOMF ¶ 13; Def.'s Resp. SOMF ¶ 13.)



In 2007, Dockwise Yacht Transport (USA), Inc. became Dockwise Yacht Transport LLC ("Dockwise LLC"). (Pl.'s SOMF ¶ 12; Def.'s Resp. SOMF ¶ 12.) And in August, the registration for the above mark was cancelled because the "registrant did not file" a declaration required to maintain it. (ECF No. 113-4.) Nevertheless, the Dockwise entities' float-on, float-off services went listed under "United Yacht Transport, Inc." or "Dockwise/United Yacht Transport, Inc." in the Port Everglades Facilities Guide & Directory for the years 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, and 2013. (Pl.'s SOMF ¶ 16; Def.'s Resp. SOMF ¶ 16.)

In November 2011, Dockwise LLC announced that it was selling its yacht transport business to an investor group known as Coby Enterprises. (Pl.'s SOMF ¶ 24; Def.'s Resp. SOMF ¶ 24.) Among the investors in Coby Enterprises was Dockwise LLC's own president at the time, Mr. Clemens Van der Werf. (*Id.*) In connection with the sale, the sidewalls of two company vessels were re-painted to read "UNITED YACHT TRANSPORT" (the "Mark") instead of "DOCKWISE YACHT TRANSPORT," as they read until then. (Pl.'s SOMF ¶¶ 25, 28; Def.'s Resp. SOMF ¶¶ 25, 28.) Bearing the Mark on their sidewalls from 2012 to 2013, the two vessels made over 50 voyages globally, which generated tens of millions of dollars in revenue. (Pl.'s SOMF ¶¶ 32-34; Def.'s Resp. SOMF ¶¶ 32-34.) However, the deal with Coby Enterprises fell through. (Pl.'s SOMF ¶ 29; Def.'s Resp. SOMF ¶ 29.)

So, in June 2013, Dockwise LLC's parent company entered negotiations with Spliethoff to sell Dockwise LLC and its vessels. (Pl.'s SOMF ¶ 39; Def.'s Resp. SOMF ¶ 39.) That sale materialized in October 2013, and by consequence of it, Dockwise LLC assigned its interests in the Mark to Spliethoff. (ECF No. 64-11.) While sales talks with Spliethoff were pending in June 2013, a separate group of individuals acquired the assets of a yacht transporting business that had gone bankrupt; they formed UYT. (Pl.'s SOMF ¶ 42; Def.'s Resp. SOMF ¶ 42.) On August 7, 2013, UYT filed an application to register the Mark as its own and days later sent out an e-mail blast to over 1,000 yacht transport customers announcing its services from Port Everglades

to foreign ports. (Pl.'s SOMF ¶¶ 48, 50; Def.'s Resp. SOMF ¶¶ 48, 50.) On August 18, 2013, Dockwise LLC's parent company filed a competing application for the Mark and sent UYT a cease-and-desist letter concerning its use of the Mark. (Pl.'s SOMF ¶¶ 53, 54; Def.'s Resp. SOMF ¶¶ 53, 54.)

    While this happened, the repainted Dockwise/Spliethoff vessels navigated the world transporting yachts and bearing the Mark on their sidewalls through December 2013. (Pl.'s SOMF ¶¶ 63-64; Def.'s Resp. SOMF ¶¶ 63-64.) One was even featured on CNBC's *Secret Lives of the Super Rich*. (Pl.'s SOMF ¶ 65; Def.'s Resp. SOMF ¶ 65.) In January 2014, Spliethoff removed the Mark from the vessels' sidewalls. (Def.'s SOMF ¶¶ 29-30, ECF No. 95; Pl.'s Resp. SOMF ¶ 29, ECF No. 110.) It chose to conduct business using "DYT" as its trade name. (Pl.'s SOMF ¶ 61.)

    Nevertheless, on November 2014, Spliethoff filed an opposition to UYT's trademark registration before the TTAB after Dockwise LLC's parent assigned it its pending trademark application in July. (Pl.'s SOMF ¶¶ 69, 71; Def.'s Resp. SOMF ¶¶ 69, 71.) Spliethoff's opposition proceeding resulted in a default judgment against UYT in February 2021, which led to the U.S.P.T.O. registering the Mark to Spliethoff in May 2021. (Pl.'s SOMF ¶¶ 73-74; Def.'s Resp. SOMF ¶¶ 73-74.)

    As matters stand today, Spliethoff and UYT both offer yacht transportation services out of Port Everglades and in many of the same markets worldwide. (Pl.'s SOMF ¶¶ 76-77; Def.'s Resp. SOMF ¶¶ 76-77.)

    Spliethoff sues UYT for a declaration of its superior rights to the Mark, and UYT countersues for cancellation of Spliethoff's trademark registration. Both have moved for summary judgment.

### 2. Legal Standard

    Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S.

144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323–24. The nonmovant's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *Id.*; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.*

### 3. Analysis

The Court begins by addressing Spliethoff's preliminary argument that the TTAB's default judgment against UYT entitles it to judgment as a matter of law under the doctrine of res judicata—both with respect to its own claim and UYT's counterclaim for cancellation.

After ruling that res judicata does not dispose of either party's claims, the Court turns to UYT's counterclaim for cancellation, and then to Spliethoff's claim for declaratory relief.

### A. Spliethoff's Res Judicata Theory Fails

Spliethoff says that res judicata bars UYT from litigating the issues of abandonment and non-use because UYT previously asserted them as affirmative defenses in the TTAB opposition proceeding that UYT lost.

Res judicata traditionally referred to claim preclusion; however, the term is now used to refer to both claim preclusion and issue preclusion, which operate differently. *Compare, e.g., Cmty. State Bank v. Strong*, 651 F.3d 1241, 1263 (11th Cir. 2011 ("Res judicata comes in two forms: claim preclusion (traditional res judicata) and issue preclusion (also known as 'collateral estoppel')") *with In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001) ("Under res judicata, also known as claim preclusion . . ."). Although Spliethoff uses the term "res judicata" in its briefs, its arguments turn on claim preclusion alone. (Pl.'s Reply 4, ECF No. 129) ("Spliethoff seeks summary judgment based on res judicata, not collateral estoppel."). So, the Court focuses its analysis on claim preclusion.

Claim preclusion "bars the filing of a claim that was raised or could have been raised in prior litigation where (1) there is a final judgment on the merits; (2) rendered by a court of competent jurisdiction; (3) that involved the same parties or individuals in privity with them; and (4) involved the same cause of action." *Soro v. Citigroup*, 287 Fed. App'x 57, 59 (11th Cir. 2008).

Default judgments rendered by the TTAB satisfy the first two elements, *see, e.g.*, *Vernon v. Ziel*, No. 18-24054-CIV, 2020 WL 4501802, at *4 (S.D. Fla. June 15, 2020) (McAliley, Mag. J.), and the parties here were those before the TTAB. Thus, only the last of these elements remains in true contention.

In that regard, UYT argues that the TTAB proceeding is distinct from this one because the TTAB proceeding was aimed at determining UYT's right to *register* the Mark whereas this case is meant to determine its alleged infringement. Spliethoff does not deny this but says that the Court must look to the "the substance of the actions, not their form[,]" to decide whether they are, in fact, the same. *See Soro*, 287 Fed. App'x at 59.

The "principal test for determining whether the causes of action are the same is whether the primary right and duty are the same in each case." *Id.* (cleaned up) (citing *Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1239 (11th Cir. 1999)). Before applying that test here, the Court notes that its evaluation of the TTAB judgment must account for the TTAB's limited jurisdiction as an administrative body. The TTAB "is empowered to determine *only the right to register* . . . . [it] is *not authorized to determine the right to use*, nor may it decide broader questions of *infringement or unfair competition*." TRADEMARK TRIAL & APPEALS BOARD MANUAL § 102.01 (2022) (emphasis added). Because it was rendered in the context of an opposition proceeding to UYT's application, any "right and duty" generated by the TTAB judgment must be understood to concern UYT's application alone.

Against that backdrop, the Court surmises that the TTAB judgment established Spliethoff's "right" to prevent *UYT's* registration of the Mark and created *UYT's* "duty" to abstain from pursuing registration. But here, the right and duty implicated by UYT's counterclaim concerns *Spliethoff's* registration. And separately, Spliethoff's claim implicates the right and duty to use/not use the Mark. Thus, although related to the TTAB proceeding, these causes of action are distinct such that the TTAB judgment has no preclusive effect here.

This ruling is not inconsistent with *Vernon*, 2020 WL 4501802, which Spliethoff cites to in support of its res judicata theory. There, this Court found that claim preclusion barred a defendant's counterclaim for the cancellation of a plaintiff's registration because the defendant's counterclaim turned on arguments she raised in a predecessor TTAB opposition proceeding that concluded in a default judgment against her. *Id.* at *1, *6.

However, a crucial difference is that *Vernon* involved only *one* application—the plaintiff's. Because the TTAB allowed the plaintiff's application to move forward by dismissing defendant's opposition, the TTAB's judgment there—unlike the one here—acknowledged the plaintiff's *right* to register the mark despite the defendant's claim to it. The defendant's subsequent counterclaim to cancel the plaintiff's registration before this Court sought to relitigate the same matter and was appropriately barred.

This case, by contrast, involves *two* competing applications—one by UYT and another by Spliethoff. Spliethoff's opposition proceeding blocked UYT's registration, but Spliethoff later had to finalize its own, separate application. Unlike the scenario in *Vernon*, the TTAB judgment here only had the effect of preserving Spliethoff's right to *pursue* its own separate registration. It did not establish Spliethoff's right *to* registration. UYT or another party could have opposed Spliethoff's application. Had Spliethoff's application been successfully opposed, neither it nor UYT would have obtained a right to registration.

As such, *Vernon* does not mandate a different outcome. And notably, in *Vernon* this Court limited the preclusive effect of the TTAB judgment to the defendant's counterclaim. It did not preclude the infringement claim, as Spliethoff argues should be done here.

This raises the consideration that although Spliethoff says it does not purport to invoke collateral estoppel (issue preclusion), using the TTAB judgment to preclude UYT from re-litigating the issues of abandonment and non-use in the contexts of UYT's counterclaim *and* Spliethoff's claim would necessarily require an exercise of collateral estoppel. The Court is not convinced the doctrine is applicable. *See In re Bush*, 62 F.3d 1319, 1323 (11th Cir. 1995) (where federal common law applies, "a default judgment will not support the application of collateral estoppel[.]"); 32 FED. PROC., L. ED. § 74:556 ("If the TTAB does not consider the marketplace usage of the parties' marks, the TTAB's decision should have no later preclusive effect in a suit where actual usage in the marketplace is the paramount issue.").

Seeing no basis for preclusion, the Court turns to the merits of the parties' claims.

### B. UYT's Counterclaim for Cancellation Fails

UYT posits that the Court should exercise its power under 15 U.S.C. § 1119 to cancel Spliethoff's registration of the Mark because it was erroneously granted. (ECF No. 47 at 15.) Although UYT asserted multiple grounds for cancellation in its countercomplaint, it now limits itself to arguing that Dockwise LLC abandoned the Mark prior to assigning it to Spliethoff and

thus had no interest in it to convey. It also argues that Spliethoff independently abandoned the Mark after the sale of Dockwise LLC's business to UYT.

To prove abandonment, UYT must show that "the plaintiff [ ] ceased using the mark in dispute, and that [it did so] with an intent not to resume its use." *Cumulus Media, Inc. v. Clear Channel Comm., Inc.*, 304 F.3d 1167, 1174 (11th Cir. 2002). This Court, along with the majority of federal courts, has required that abandonment be proven by "clear and convincing evidence." *See Navaka, LLC v. South Pacific Elixir Co.*, No. 19-cv-81128, 2020 WL 4601641, at *6 (S.D. Fla. Aug. 10, 2020) (Singhal, J.); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:2 (5th ed. 2022) [hereinafter "McCarthy"] ("The majority of courts have interpreted the 'strictly proved' rule to mean that evidence of the elements of abandonment must be clear and convincing."); *see also Cumulus*, 304 F.3d at 1174 ("Federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict' burden of proof.").

Intent "may be inferred from circumstances" but a mark's nonuse for three "consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. The "use" of a mark means "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." *Id.* A mark is used in commerce "when it is used or displayed in the sale or advertising [of a service.]" *Id.*

### (1) *Dockwise's Alleged Abandonment*

According to UYT, there "is simply no record evidence of any bona fide use of the Mark by Dockwise from ***at least*** 2003 to present." (Def.'s MSJ at 3, ECF No. 97 (emphasis in original).) For proof, it points to the statements of the André Goedée who served as the CEO of Dockwise LLC's Netherlands-based parent company from 2003 to 2013. He represented to a Dutch Court that Dockwise LLC "never operated under the name United Yacht Transport." (ECF No. 96-1 at ¶ 4.) UYT also relies on the testimony of Catalina Bujor, who was Dockwise LLC's marketing officer from April 2006 to January 2015. She testified that when she started at the company no marketing materials exhibiting the Mark were used with clients, and that "[f]or the most part" the company had stopped using United Yacht Transport as its name. (Depo. of Catalina Bujor 10:14-17, ECF No. 96-2.)[1] UYT additionally proffers the testimony of Jonathan Zier who served as Dockwise LLC's loading master from 2005 to 2010. He testified that when he started working with the company, it

---

[1] The parties have only filed partial depositions transcripts. For ease of reference, the Court's citations are to the page numbers assigned by the CM/ECF filing system for all depositions.

did not use the Mark or any other name. (*See* Depo. of Jonathan Zier 6:13-22, ECF No. 96-3.)

Assuming the above testimony is true, UYT successfully invokes the statutory presumption in favor of the Mark's abandonment in the early 2000s. (*See* Def. MSJ 6.) But even if the Mark had been abandoned "in the early 2000s, and certainly by 2007," (Def.'s MSJ 6), such abandonment would be irrelevant because it predates the 2013 registration filing date here. (ECF No. 64-13.) *See* MCCARTHY § 17:3 ("[p]ossible abandonment by the registrant during a time period *prior* to a challenged registration's filing date is irrelevant to the validity of that registration." (emphasis in original)); *see also Brewski Beer Co. v. Brewski Bros, Inc.*, No. 21735, 1998 WL 416757, 47 U.S.P.Q. 2d 1281 (T.T.A.B. May 6, 1998) ("respondent's *registration* of BREWSKI BROTHERS for sportswear could not be challenged on the basis of this earlier period of purported abandonment inasmuch as the application to register said mark was not filed until [after the alleged abandonment.]") (emphasis in original).

Spliethoff argues that the Mark was never abandoned—including in 2013 when Dockwise LLC's parent applied to register the Mark. As evidence of the Mark's use, it points to the consistent annual listings of "United Yacht Transportation" in the Port Everglades print and online directories dating as far back as 2001. (Pl.'s Opp. 4, 9, ECF No. 111.) Those listings qualify as "advertisement" of the company's services and "commercial use" under 15 U.S.C. § 1127, it says. Spliethoff also points to the Mark's use on the sidewalls of the company's vessels in 2012 and 2013. During that period, the vessels conducted dozens of voyages worldwide, and one was even featured on national television bearing the Mark.

UYT retorts that Spliethoff's "phone book" listings amount to nothing more than "token use" aimed at reserving an interest in the name. (*See* Def.'s Opp. 5, ECF No. 114.) It also challenges the relevance of the Mark's use on the vessels sidewalls by asserting that Dockwise LLC's parent company never authorized the vessels' re-painting to bear the Mark. In fact, UYT suggests that Mr. Van der Werf, president of Dockwise LLC at the time, illicitly advanced the re-painting project at Dockwise LLC's expense so that Coby Enterprises, in which he was invested, could assume use of the Mark after the then-pending sale to his entity. (*See id.* at 7.)

UYT advances this theory by relying on Mr. Goedée's statement that the parent company "did not give [Dockwise LLC] official permission to use another name for the ongoing business." (Statement of André Goedée ¶ 20, ECF No.

113-1.)[2] It also points to his representation that the vessels' repainting "may have been [suggested] . . . but if so I am sure it was officially rejected to prevent the company from making unnecessary cost prior to the proposed transaction [between Dockwise LLC and Coby Enterprises.]" (*Id.* ¶ 24.)

Spliethoff vehemently opposes UYT's "token use" argument, and Mr. Van der Werf himself testified that the re-naming project was authorized by Dockwise LLC's parent company. (*See* Depo. of Clemens Van der Werf 53-54, ECF No. 59-1.) Yet Spliethoff also posits that the authorization of the sidewalls' painting is irrelevant to the question of whether Dockwise LLC actually used the Mark in commerce. (Pl.'s Reply 8-9.) The Court agrees.

UYT cites no authority to support its theory that the law requires a parent company to sanction its subsidiary's use of a mark for that use to be cognizable in this context. And even then, Mr. Goedée represented that the parent company gave Dockwise LLC "a large amount of freedom to manage its own business in Ft. Lauderdale." (Statement of André Goedée ¶ 39.) It is textbook law that the origination of trademark rights must be objectively measured: "[t]rademark rights *flow from use*, not from intent to protect rights." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1550-51 (11th Cir. 1986) (emphasis added); *see also Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008). Intent, as more thoroughly discussed below, only becomes relevant when evaluating whether those rights have been abandoned.

Objectively, then, the undisputed facts show that from 2012 to 2013, two of Dockwise LLC's vessels bore the Mark as they transported yachts to and from ports around the world, including Port Everglades, and generated millions in doing so. (Pl.'s SOMF ¶¶ 63-64; Def.'s Resp. SOMF ¶¶ 63-64; Depo. of Laura Tempest, 31-35, 40-41, 46-47, 51; ECF No. 66-1; ECF No. 66-3 at 1, 50.) This indisputably constitutes statutorily defined "use in commerce." 15 U.S.C. § 1127. And logically, the Mark's use cannot also be evidence of Dockwise LLC's intent to abandon it. For that reason, it is irrelevant that Dockwise LLC continued to carry out its business under the "Dockwise" name while the vessels bore the Mark, as UYT is keen on pointing out (*See* Def.'s SOMF ¶ 22). That does not change the fact that Dockwise LLC still actually used the Mark in commerce.

Moreover, there is no evidence in the record that Dockwise LLC's use of the Mark was not "bona fide." A mark's use is not "bona fide" where it is "made merely to reserve a right in a mark." *See* 15 U.S.C. § 1127. UYT cannot

---

[2] UYT refers to ECF No. 113-1 as Mr. Goedée's "deposition." That document seems to consist of, among others, a "report of the hearing of witness" before a court in the Netherlands that has appended to it Mr. Goedée's written answers to a list of questions that seem to have been provided to him by that court. This Court's citations are to those responses.

reasonably show that the Mark was painted on the vessels' sidewalls to "merely to reserve a right" in the Mark and preempt UYT. The decision to use the Mark was made as early as 2011 in contemplation of Dockwise LLC's sale to Coby Enterprises. (*See* Depo. of Clemens Van Der Werf  29-30, 40-41 62, 98;  Pl.'s SOMF ¶ 24; Def.'s Resp. SOMF ¶ 24.) UYT was not in the picture. And even then, the Mark was painted on the vessels' sidewalls in 2012—well before UYT's claimed first use of the Mark in July 2013. (ECF No. 65-6.)

So, even assuming that it had abandoned use of the Mark earlier in the 2000s then, Dockwise LLC's bona fide use of the Mark in 2012 would it make it the priority user. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 30 cmt. a (1995) ("If the original owner resumes use of a designation that has been abandoned under the rules stated in this Section, the owner's priority [ ] is determined solely on the basis of the subsequent use.").

That conclusion is directly supported by the Court of Custom and Patent Appeals' ruling in *Income Tax Service Company v. Fountain*, 475 F.2d 655 (C.C.P.A. 1975). There, Bruce Fountain began engaging in the business of preparing tax returns under the name of Income Tax Services Company in 1964. Fountain acquired the business from a man named Ziegelhofer, who, in turn, acquired it from another named MacNiel. MacNiel registered a mark containing an "ITS" logo for the business in 1950 and allegedly conveyed it to Ziegelhofer. In 1956, however, the registration was cancelled for failure to file an affidavit of continuing use. In 1965, a competitor named Income Tax Service Company ("ITS Co.") obtained registration of the trademark "ITS," which prompted Fountain to file a petition for cancellation. ITS Co. argued that it was a successful intervening user. It said that its mark should not be cancelled because Fountain's predecessors had abandoned their mark and thus Fountain, at best, only had a common law interest in it. *Id.* at 657.

However, the court found that Fountain's use of the mark in 1964 made him the priority user regardless of any past abandonment by his predecessors-in-interest. The Court reasoned: "we do not find [ITS Co.'s] argument based upon abandonment to be appropriate since all of the facts which allegedly resulted in appellee's having abandoned the mark took place *prior* to the earliest date of use relied upon by [ITS Co.] and there is no question that appellee was continuously using the mark from a time at least two years before the filing of the petition to cancel." *Id.* (emphasis in original). Thus, Fountain's resumed use of the mark in 1964 gave him priority use over ITS Co., which applied to register the mark in 1965.

By corollary, because Dockwise LLC indisputably used the Mark in 2012 (Pl.'s SOMF ¶¶ 32-34; Def.'s Resp. SOMF ¶¶ 32-34) before UYT's first claimed use (ECF No. 65-6), Dockwise LLC would still be the priority user even if it, or

its predecessors, had abandoned the Mark before then. And, naturally, Dockwise LLC's priority interests in the Mark transferred to Spliethoff by way of the assignment agreement in October 2013. (ECF No. 64-11.)

The Eleventh Circuit's decision in *AmBrit, Inc. v. Kraft, Inc.* is also instructive. 812 F.2d 1531 (11th Cir. 1986). That case involved a product packaging trademark that Kraft acquired in 1929 but had not used for decades. Seeking to compete with the Klondike Bar in the 1980s, Kraft introduced the Polar B'ar. It bore packaging that Kraft asserted was protected by its decades-old mark, but the packaging was similar to the Klondike Bar's, which was protected by a its own mark. The similarity in the ice cream products' packaging resulted in an infringement suit between their manufacturers. Although the Klondike Bar bore the later-in-time registration, the Eleventh Circuit upheld its petition to cancel the Polar B'ar's. It ruled that the Polar B'ar's "registered trademark, once abandoned [by non-use], [could] be cancelled even after [Kraft resumed] use of the mark" because the Klondike Bar's rights "flow[ed] . . . from [Kraft's] abandonment." *See id.* at 1551. Thus, the Eleventh Circuit recognized that an intervening user could be entitled to priority use of a mark where its previous holder abandoned it.

The difference between *AmBrit* and this case is that UYT is not in the position of the Klondike Bar. That is, the Klondike Bar was a successful intervening user of the mark at issue because the Klondike Bar initiated its use *before* the Polar B'ar resumed its use of the abandoned packaging mark. Thus, the Klondike Bar became the priority user. Here, even assuming that Dockwise LLC *did* abandon the Mark at some relevant point, the record indisputably shows that it resumed use of the Mark *before* UYT used it by painting the Mark on its vessels' sidewalls. Although Dockwise LLC's reuse of the Mark in 2012 would not "retroactively cure its [purported] past abandonment," *AmBrit*, 812 F.2d at 1150, it certainly would allow Dockwise LLC to claim rights in the Mark beginning in 2012 because there was no intervening use before then.

In sum, UYT cannot reasonably show that Dockwise LLC abandoned the Mark at a time relevant to this case. Instead, Dockwise LLC's use of the Mark in 2012 and 2013 lays the foundation for Spliethoff's status as its priority user vis-à-vis UYT.

### (2) *Spliethoff's Alleged Abandonment*

But UYT also argues that Spliethoff separately "abandoned the Mark in January 2014 when Spliethoff permanently removed the 'UNITED' name from its recently purchased vessels and made the decision to use 'DYT' going forward." (Def.'s Reply 9, ECF No. 130.)

Again, to prove abandonment, UYT must show that Spliethoff "ceased using the mark in dispute, *and* that [it did so] with an intent not to resume its use." *Cumulus*, 304 F.3d at 1174 (emphasis added). UYT cannot reasonably do so. Even assuming that Spliethoff's removal of the Mark on the vessels' sidewalls is evidence that it "ceased using the mark in dispute," UYT does not establish that Spliethoff did so "with an intent not to resume" use of the Mark.

Spliethoff says it only removed the Mark from its vessels to avoid having its ships serve as marketing units for UYT. (Pl.'s MSJ 7; Depo. of Richard Klabbers 42-43, ECF No. 64-1.) And with good reason, it suggests. Dennis Cummings, a consultant hired by UYT's principal in the company's early days, testified that UYT personnel joked that the Mark's use on Spliethoff's ships served as free advertising for UYT. (Depo. of Dennis Cummings 35, ECF No. 65-1.) It was Cummings who at least partially masterminded the strategy behind UYT's use of the Mark. He testified: "I chose the color orange, which was very similar to the Dockwise color orange, to design a website [for UYT] . . . . the orange in that shade was chosen to mimic the website of Dockwise which used the orange . . . . we chose it for familiarity and to try to sneak under the radar, if you want to call it that, and hope that we can maybe have people that we were somehow associated with Dockwise Yacht Transport." (*Id.* at 47-49.) Thus, Spliethoff's "free advertising" concern was reasonable, at minimum.

Additionally, the managing director of Spliethoff's yacht transportation unit testified that the company originally considered its rebranding to "DYT" to be temporary solution to UYT's use of the Mark, and that the company revisited the matter at least once per quarter into 2015. (*See* Depo. of Richard Klabbers 43, 44, 47, 59:20-23.) Paired with that, the record shows that Spliethoff acted diligently to protect its interests in the Mark. It filed a letter of protest to UYT's trademark application only two days after being assigned Dockwise LLC's pending trademark application, it filed a formal opposition to UYT's application, and it has been litigating its rights to the Mark for more than half a decade. (*See* Pl.'s SOMF ¶¶ 70-73; Def.'s SOMF ¶¶ 70-73.)

Spliethoff has continued to list itself annually as "DYT/Dockwise/United Yacht Transport" or "Dockwise/United Yacht Transport" in the Port Everglades directory since 2014. (Pl.'s MSJ 7.) But perhaps most importantly, Spliethoff has repeatedly asserted its intent to resume commercial use of the Mark when able to do so. (Pl.'s MSJ 8; Depo. of Richard Klabbers 47:4-20; ECF No. 113-14 at 4-7.)

Although none of these factors alone proves dispositive, the Court finds that, given the circumstances, UYT cannot reasonably show that Spliethoff ceased using the Mark with an intent to not resume its use. And indeed, the law allows for intent to be "inferred from the circumstances." *See* 15 U.S.C.

§ 1127; RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 30 cmt. b (1995) ("The reason for the cessation of use is relevant in assessing the intentions of the former user. Forced suspensions of use due to temporary factors beyond the control of the trademark owner such as natural disasters, war, or temporary legal prohibitions are ordinarily not sufficient to justify an inference that the owner does not intend to resume use of the designation.").

Further, even assuming that UYT has sufficiently established Spliethoff's non-use of the Mark over a three-year period so as to trigger the statutory presumption in favor of abandonment, *see* 15 U.S.C. § 1127, the Court finds that Spliethoff meets its burden in rebutting that presumption given the above. *See Cumulus*, 304 F.3d 1167 ("once a defendant establishes a case of prima facie abandonment, the burden of proof then shifts to the mark holder to demonstrate that circumstances do not justify the inference of intent not to resume use.") (cleaned up); *see also AmBrit*, 812 F.2d at 1176. It simply is not reasonable to infer that Spliethoff intended to not resume use of the Mark.

Because UYT cannot reasonably show that neither Dockwise LLC nor Spliethoff abandoned the Mark, the Court denies UYT's motion for summary judgment on its cancellation counterclaim and proceeds to considering the merits of Spliethoff's claim.

### C. Spliethoff Prevails on its Claim for a Declaratory Judgment

Spliethoff asks the Court to enter a judgment that declares its rights in the Mark to be superior to UYT's and recognizes its right to preclude UYT's use of the Mark. (Am. Compl. 14, ECF No. 18.) The Federal Declaratory Judgment Act allows the Court to "declare the rights and other legal relations of any interested party" in a "case of actual controversy within its jurisdiction[.]" *See* 28 U.S.C. § 2201. The Court already found this case to present an "actual controversy" in its Order of April 4, 2022, which denied UYT's motion to dismiss (ECF No. 36). So, all that remains are the merits.

#### (1) *Trademark Infringement*

Spliethoff advances its claim on a trademark infringement theory. (Pl.'s MSJ 3.) "[T]o prevail on a federal trademark infringement claim under [15 U.S.C.] § 1114, [a plaintiff must] demonstrate (1) that its marks had priority over [the defendant's] and (2) that [the defendant's] marks were likely to cause consumer confusion." *Fla. Int'l Univ. Bd. of Tr.'s v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016).

The Court has already made a finding of Spliethoff's priority over the Mark stemming from at least 2012. And the record is clear that Spliethoff now

holds the Mark's registration. (ECF No. 92-2.) As such, the only remaining consideration turns on the test's second prong, which looks to the risk of consumer confusion.

Courts typically consider seven factors in assessing the likelihood of consumer confusion. Those are: "(1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's goodwill; and (7) the existence and extent of actual confusion in the consuming public." *Fla. Int'l*, 830 F.3d at 1255.

The first four factors go easily established. First, UYT does not contest Spliethoff's assertion that the Mark is best classified as an "arbitrary" one (Pl.'s MSJ at 10), which implies the strongest of trademark protections. *See Boigris v. EWC P&T, LLC*, No. 19-21148-CIV, 2020 WL 1695462, at *6 (S.D. Fla. Feb. 25, 2020) (Scola, J.), *aff'd*, 7 F.4th 1079 (11th Cir. 2021) ("marks are classified, in order of increasing strength, as generic, descriptive, arbitrary, or fanciful."). Second, similarity is a given because there is only one Mark at issue. Third, the parties indisputably overlap in customer base; and fourth, both provide yacht transportation services in many of the same regions globally.

Fifth, although UYT denies that Mr. Cummings served as its agent (Def.'s Resp. SOMF ¶ 44), his testimony unequivocally establishes that he—at least in designing UYT's website—intended to create a false impression of UYT's being related to Dockwise LLC:

> Q: So the intention was to create the impression that United Yacht Transport, the new company that bought the Yacht Path assets, was somehow connected with Dockwise, United Yacht Transport, you were trying to create some kind of message there?
>
> A: I don't know that I was trying to create a message. What I was trying to do was capitalize with the colors that Dockwise Yacht Transport had chosen in their media pieces, in their ships, in everything they did [. . .] so the answer to your question is, we chose it for familiarity and to try to sneak under the radar, if you want to call it that, and hope that we can maybe have people think that we were somehow associated with Dockwise Yacht Transport.
>
> Q: Did it work?

> A: I believe it worked, yes.

(Depo. of Dennis Cummings 48:16-49:10.)

Sixth, in even suggesting to UYT's principal that the company use the Mark, Mr. Cummings knew from his experience in the industry that customers had historically associated the Mark with Dockwise LLC.

> Q: Can you expand on why you believe [sic] that the name United Yacht Transport would be a successful name to be used by the new entity that was being headed up by Paul Haber?
>
> A: [. . .] The name was very familiar to me, the name was very familiar to the industry, and my basis for claiming that it was familiar to the industry is based upon the phone calls that we used to receive at Yacht Path International from yacht brokers and yacht captains saying they had received another quote from United Yacht Transport.
>
> Q: They were referring to Dockwise?
>
> A: They were referring to Dockwise. We did not correct them, because we knew, my staff, myself knew, that they had meant Dockwise Yacht Transport.
>
> Q: Is it fair to say that even after Dockwise began operating the "Yacht Express" and the "Super Servant 4" semi-submersible vessels that in the yacht transport industry captains, brokers, yacht owners, port agents and others in the industry would refer to Dockwise as Dockwise, United Yacht Transport or Dock Express kind of interchangeably?
>
> A: Yes, that was correct [. . .]

(Depo. of Dennis Cummings 29:2-30:12.) Importantly, Mr. Cummings said he made sure to disclose these facts to UYT's principal. (*Id.* at 31:22.)

Against that backdrop, the Court turns to the last and perhaps the most important of the seven factors: "the existence and extent of actual confusion in the consuming public." *See Fla. Int'l*, 830 F.3d at 1265 ("[e]vidence of confusion by actual or potential customers is, of course, the best evidence of a likelihood of confusion."). Laura Tempest, the general manager of Spliethoff's yacht transportation business, testified that she "actually had people walk into the office thinking we're United Yacht Transport." (Depo. of Laura Tempest 71:3-4,

ECF No. 66-1.) She also testified that she had interactions with customers asking about sailing schedules or asking her when their yachts would be delivered only to later realize these customers were UYT's. (*Id.* at 72:3-9.) Although "the quantum of evidence needed to show actual confusion is relatively small," *Fla. Int'l,* 830 F.3d at 1265 (cleaned up), the record readily establishes it here.

On balance, the Court has no trouble finding that UYT's use of the Mark implicates a likelihood of confusion among the parties' customers.

### (2) *UYT's Affirmative Defenses*

UYT's affirmative defenses do not change the Court's conclusions. It asserts the following against Spliethoff's claim: (1) abandonment, (2) unclean hands, (3) invalidity, and (4) inequitable conduct. (ECF No. 47 at 8.) The Court has extensively examined the abandonment issue above and need not revisit it.

As to unclean hands, UYT baldly asserts that Spliethoff "has no legitimate interest in the United Yacht Transport mark and only seeks to prevent [UYT]" from using the mark. (*Id.*) That does not establish an unclean hands defense. To successfully avail itself of the doctrine, a defendant must "demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted" and that the "plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by her conduct." *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 451 (11th Cir. 1993). UYT only complains that Spliethoff is suing it. The Court does not see how bringing a lawsuit can alone qualify as "wrongdoing." This defense fails.

Next, UYT says that Spliethoff's claim is barred as invalid because it "never acquired valid rights and goodwill in the mark from Boskalis." (ECF No. 47 at 8.) This argument also fails. Boskalis "is the company that sold Dockwise Yacht Transport LLC and all of its subsidiaries to Spliethof[f]" after acquiring Dockwise LLC's parent company. (*See* Statement of André Goedée ¶ 56; ECF No. 109-8 at 9-10.) UYT does not dispute that Dockwise LLC's parent company (i.e., the entity acquired by Boskalis) assigned its interests in the Mark to Spliethoff. (*See* ECF No. 64-11.) Nor does UYT point to anything in the record concerning Boskalis's consent/non-consent of the assignment, or the relevance of such consent. Thus, this defense goes unsupported.

Last, UYT says that Spliethoff acted in bad faith when it filed its trademark application while allegedly knowing "that any rights had been abandoned and/or were not acquired in its acquisition from Boskalis." There is

simply nothing in the record that would reasonably substantiate that assertion. All of UYT's affirmative defenses fail.

### 4. Conclusion

For these reasons, the Court enters summary judgment in Spliethoff's favor, thereby **granting** Spliethoff's motion (**ECF No. 93**) and **denying** UYT's (**ECF No. 97**). Noting Spliethoff's request for a supplemental order to this declaratory judgment pursuant to 28 U.S.C. § 2202, the Court **orders** Spliethoff to file with the Court a proposed version of the same no later than **ten days** from the date of this Order. Spliethoff is instructed to contemporaneously provide a courtesy copy of that proposed order in Word (.docx) format to the Court via e-mail at scola@flsd.uscourts.gov.

The Clerk is directed to **close** this case.

**Done and ordered** in Miami, Florida, on November 17, 2022.

_____
Robert N. Scola, Jr.
United States District Judge